IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| LILLIE ANN LOPEZ and JANA YOUNG, | § |
| | § |
| Plaintiffs, | § |
| | § |
| v. | § |
| | § |
| CITY OF HOUSTON, et al., | § |
| | § |
| Defendants. | § |

CIVIL ACTION NO. H-09-0420

## MEMORANDUM OPINION AND ORDER

The City of Houston Charter provides for a fourteen-member City Council. Nine council members are elected from single-member districts and five additional members are elected at-large. The Charter requires that two additional single-member positions be added to the Council if a determination is made pursuant to the Charter that the population of Houston is greater than or equal to 2.1 million people.

In their First Amended Complaint (Docket Entry No. 24) the plaintiffs, Lillie Ann Lopez and Jana Young, contend that recent population estimates indicate that the population of Houston surpassed 2.1 million no later than 2007. They contend that the City Controller has made a determination pursuant to the City Charter that the city's population now exceeds 2.1 million people. The plaintiffs assert that the Charter provision requiring the increase in size of the City Council has therefore been triggered. The plaintiffs allege that the City Council has refused to

acknowledge the recent population data, however, and instead has relied on data from the 2000 federal census to conclude that Houston's population remains below the 2.1 million person threshold.   Plaintiffs allege that the Council has taken the position that the addition of the two new single-member council positions is not required until the Council determines that the population exceeds 2.1 million people, regardless of what the City Controller may have determined.

The plaintiffs instituted this action seeking declaratory and injunctive relief against the City of Houston, each of the members of the City Council, the Mayor, and the City Controller.   The plaintiffs assert that the City Council's refusal to consider population data other than the 2000 census and its refusal to implement the required increase in the size of the Council until it determines that the city's population exceeds 2.1 million people amount to violations of sections 2 and 5 of the federal Voting Rights Act, as well as the Fourteenth and Fifteenth Amendments to the United States Constitution.

The defendants have filed a Motion to Dismiss (Docket Entry No. 4) and a Supplemental Motion to Dismiss (Docket Entry No. 27) asserting that the court lacks subject matter jurisdiction and, alternatively, that the plaintiffs have failed to state a claim for which relief can be granted.[1]   In opposition to the defendants'

---

[1]In support of these motions, the defendants filed a Brief in Support of Defendants' Motion to Dismiss (Docket Entry No. 5) and (continued...)

motions, the plaintiffs have filed Plaintiffs Lillie Ann Lopez and
Jana Young's Memorandum in Response to Defendants' Motion to
Dismiss (Docket Entry No. 25) and Plaintiffs' Response to
Defendants' Supplemental Motion to Dismiss (Docket Entry No. 29).
As explained below, the court has subject matter jurisdiction over
this action.  The plaintiffs, however, have failed to state a claim
for which relief can be granted.  Accordingly, the defendants'
motion to dismiss will be granted.

## I.  **Background**

Article V, § 2, of the City of Houston Charter, as amended in
1979, provides for a fourteen-member City Council.  City of Houston
Charter art. V, § 2.[2]  Nine members are elected from single-member
districts and five members are elected at-large.  Id.  Article V,
§ 2 states:  "If, upon any determination of the population of the
City pursuant to this Charter, such population is determined to be
2,100,000 persons or more, then the number of Council Members for
the regular terms next commencing and continuing thereafter shall
increase from fourteen to sixteen."  Id.  The two new council
positions are to be elected from two new single-member districts.
Id.  Article V, § 3 provides, in pertinent part:

---

[1](...continued)
Defendants' Reply Brief in Support of Its Motion to Dismiss (Docket
Entry No. 28).

[2]Article V of the City of Houston Charter is included in
Plaintiffs Lillie Ann Lopez and Jana Young's Memorandum in Response
to Defendants' Motion to Dismiss, Docket Entry No. 25, at
Exhibit A.

In each year during which a City General Election is to be held, the City Council shall conduct an investigation and determine the population of the City and the population of each of the districts from which District Council Members are to be elected. Each such determination shall be based upon the best available data, including, but not limited to, the most recent federal census. Each such determination shall be expressed in a [sic] ordinance, which shall be a final determination for purposes of this Charter.

After any such determination, if the distribution of population among the various districts is determined by the City Council to be materially unbalanced, or if the number of Council Members increases from fourteen to sixteen, then the City Council shall establish new boundaries for the election of District Council Members.

Id. art. V, § 3.

In November of 2004 Article VI-a of the Charter was amended to add § 7, a provision limiting the growth of the city's annual revenue. See id. art. VI-a, § 7.[3] Under § 7 the amount by which the city's annual revenue may increase over the previous year's revenue is determined based in part on "the rate of change in the City's 'Population' . . . ." Id. art. VI-a, § 7(1). The rate of change in the city's population is to be determined using annual population data "obtained from the State of Texas' State Data Center, and will be adjusted every ten years to the City's official census per the United States Department of Commerce-Bureau of the Census." Id. art. VI-a, § 7(6)(c). Each year, "the City

---

[3]Article VI-a of the City of Houston Charter is included in Plaintiffs Lillie Ann Lopez and Jana Young's Memorandum in Response to Defendants' Motion to Dismiss, Docket Entry No. 25, at Exhibit B.

Controller must furnish a written verification that the budget complies with the" revenue cap.  <u>Id.</u> art. VI-a, § 7(2).

The plaintiffs, Lillie Ann Lopez[4] and Jana Young,[5] assert that -- and include exhibits with their First Amended Complaint showing that -- the city's Planning and Development Department estimated the population of the City of Houston to be 2,231,335 as of January 1, 2007, and that the United States Census Bureau estimated the population of the City of Houston to be 2,208,180 as of July 1, 2007.[6]

The plaintiffs also allege that the State of Texas' State Data Center, the designated source for data that is to be used to determine the rate of change in Houston's population for purposes of Article VI-a, § 7 of the Charter, estimated the population of Houston to be 2,139,408 on July 1, 2007, and to be 2,149,948 on January 1, 2008.[7]  The plaintiffs assert, based on this data, that a determination has been made by the City Controller pursuant to

---

[4]Lillie Ann Lopez is a United States citizen and a registered voter living in the City of Houston.  Plaintiffs' First Amended Complaint, Docket Entry No. 24, ¶ 3.  She asserts that she is a "member of a class consisting of those citizens of Spanish heritage who are eighteen years and older and eligible to vote . . . ."  <u>Id.</u>

[5]Jana Young is a United States citizen and a registered voter living in the City of Houston.  <u>Id.</u> ¶ 4.  She asserts that she is a "member of a class consisting of those citizens of African American heritage who are eighteen years and older and eligible to vote . . . ."  <u>Id.</u>

[6]<u>Id.</u> ¶¶ 41-42, Exhibit A, Exhibit B.

[7]<u>Id.</u> ¶ 43 (citing State of Texas' State Data Center's 2007 Total Population Estimates for Texas Places, http://txsdc.utsa.edu/tpepp/2007_txpopest_place.php).

Article VI-a, § 7 of the City Charter that the population of the City of Houston is greater than 2,100,000.[8]  The plaintiffs contend that Article V, § 2's requirement to increase the size of the City Council from fourteen to sixteen members has therefore been triggered.[9]  Plaintiffs allege that the City Council has nevertheless refused to implement the required change to the size of the Council, and intends not to increase the size of the Council before the upcoming city elections scheduled for November of 2009.[10]

The plaintiffs contend that the City Council officially enacted this policy on February 18, 2009, when it passed Ordinance 2009-0136,[11] an "ORDINANCE determining the population of the City and the population of each of the Council Districts for purposes of Article V Section 3 of the City Charter; making various findings and provisions related to the subject."[12]  The plaintiffs assert that this ordinance determined the population of the City of Houston to be 1,953,631 people, and that this determination was based solely on the population of the city as reported in the 2000 federal census.[13]  The plaintiffs contend that the 2000 federal

---

[8]Id. ¶ 44.

[9]See id. ¶¶ 46-47.

[10]Id.

[11]See id. ¶¶ 53-60.

[12]Minutes of Houston City Council, No. 2009-0072-1, at 32 (Feb. 18, 2009) (included Plaintiffs' First Amended Complaint, Docket Entry No. 24, at Exhibit C).

[13]Plaintiffs' First Amended Complaint, Docket Entry No. 24, ¶¶ 53-54.

census data, alone, is not the "best available data."[14]   The
plaintiffs further allege that the Council's refusal to implement
the increase from fourteen to sixteen members amounts to the
adoption of a policy that Article V, § 2's mandate to increase the
size of the City Council from fourteen to sixteen members can only
be triggered by a determination by the Council pursuant to Article
V, § 3 that the population exceeds 2.1 million, and not by "any
determination of the population of the City pursuant to this
Charter," as Article V, § 2 requires.[15]

The plaintiffs instituted this action against the City of
Houston, each of the individual members of the Houston City
Council, the Mayor, and the City Controller.[16] After amending their
complaint, the plaintiffs now seek declaratory and injunctive
relief on the grounds that the City Council's actions amount to
violations of § 2 and § 5 of the federal Voting Rights Act ("VRA"),
the Equal Protection Clause of the Fourteenth Amendment to the
United States Constitution, and the Fifteenth Amendment to the
United States Constitution.[17]

The plaintiffs do not allege that they are entitled to relief
based on a violation of the City Charter, nor do they ask this

_____

[14]Id. ¶ 55.

[15]See id. ¶¶ 49-50.

[16]See Plaintiff's Original Complaint, Docket Entry No. 1.

[17]See Plaintiffs' First Amended Complaint, Docket Entry No. 24.

-7-

court to order the City to comply with its Charter. The plaintiffs' claims for relief are instead based only on alleged violations of rights secured by federal statutes and the federal Constitution.

The defendants have filed a Motion to Dismiss and a Supplemental Motion to Dismiss asking the court to dismiss all of the plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(1) because the court lacks subject matter jurisdiction or, alternatively, pursuant to Federal Rule of Civil Procedure 12(b)(6) because the plaintiffs have not stated a claim for which relief can be granted.[18]

## II.  <u>Subject-Matter Jurisdiction</u>

The defendants assert that the court should dismiss this action for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) because the facts alleged by the plaintiffs do not entitle them to relief under the federal statutes and constitutional provisions that they invoke. "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." <u>Home Builders Ass'n of Miss., Inc. v. City of Madison</u>, 143

---

[18]<u>See</u> Defendants' Motion to Dismiss, Docket Entry No. 4; Defendants' Supplemental Motion to Dismiss, Docket Entry No. 26. The defendants also ask, in the event that the court does not dismiss all of the plaintiffs' claims, that the court dismiss the individual defendants, leaving the city itself as the only defendant. <u>See</u> Defendants' Motion to Dismiss, Docket Entry No. 4, ¶ 6. Because the court will dismiss all of the plaintiffs' claims, this request is moot.

F.3d 1006, 1010 (5th Cir. 1998) (quoting <u>Nowak v. Ironworkers Local</u> <u>6 Pension Fund</u>, 81 F.3d 1182, 1187 (2d Cir. 1996)). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." <u>Ramming v. United States</u>, 281 F.3d 158, 161 (5th Cir. 2001).

The bar is low for a plaintiff asserting jurisdiction based on a federal question. The plaintiffs' complaint need only "purport" to state a federal claim. <u>United States v. St. Landry Parish Sch.</u> <u>Bd.</u>, 601 F.2d 859, 861 n.1 (5th Cir. 1979). <u>See also</u> <u>Daigle v.</u> <u>Opelousas Health Care, Inc.</u>, 774 F.2d 1344, 1347 (5th Cir. 1985) (holding that the court had jurisdiction because the plaintiffs' "complaint stated a [federal] claim on its face"). Even if the plaintiffs' federal claims are not actionable, the court still has subject matter jurisdiction. As the Fifth Circuit has explained,

> when a defendant's challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action, the proper procedure for the district court is to find that jurisdiction exists and to deal with the objection as a direct attack on the merits of the plaintiff's case.

<u>Daigle</u>, 774 F.2d at 1347.

The plaintiffs assert that the court has jurisdiction pursuant to multiple federal statutes including 42 U.S.C. § 1973j(f) and 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4). 42 U.S.C. § 1973j(f) grants district courts jurisdiction over any "proceedings instituted pursuant to this section." The general federal question statute, 28 U.S.C. § 1331, grants the court "original jurisdiction

of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1343(a)(3) provides that the district court may exercise jurisdiction over "any civil action authorized by law to be commenced by any person" to redress deprivations, under the color of state law, of any right "secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States." 28 U.S.C. § 1343(a)(4) grants the court jurisdiction over civil actions by any person "[t]o recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote."

Because the plaintiffs' complaint "purports to state claims under several sections of the Voting Rights Act, and each of these sections has a special jurisdictional statute," the court has subject matter jurisdiction over the plaintiffs' VRA claims. St. Landry Parish Sch. Bd., 601 F.2d at 861 n.1 (citing, inter alia, 42 U.S.C. § 1973j(f) as a statutory basis for jurisdiction). Similarly, because the plaintiffs' complaint alleges that their federal constitutional rights were violated, and they seek relief for those violations under 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201 and 2202,[19] the court has jurisdiction over the plaintiffs'

---

[19]42 U.S.C. § 1983 and 28 U.S.C. §§ 2201 and 2202 are merely remedial statues; in other words, they provide plaintiffs with (continued...)

constitutional claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and/or 1343(a)(4).  See Holy Cross Coll., Inc. v. La. High Sch. Athletic Ass'n, 632 F.2d 1287, 1289 (5th Cir. 1980) (holding that the court had subject matter jurisdiction over the plaintiff's claim, which alleged a violation of a constitutional right and sought relief under 42 U.S.C. § 1983, since the claim was "clearly 'drawn to seek recovery under a federal statute'" (quoting Spector v. L Q Motor Inns, Inc., 517 F.2d 278, 281 (5th Cir. 1975)). Accordingly, the court will deny the defendants' motion to dismiss for lack of subject matter jurisdiction.

## III.  **Failure to State a Claim**

The defendants also contend that this action should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) because the plaintiffs' complaint fails to state a claim for which relief can be granted.  When evaluating a 12(b)(6) motion, the court "must limit [its] inquiry to the facts stated in the complaint and the documents either attached to or incorporated in the complaint . . . [and] matters of which [it] may take judicial

---

[19](...continued)
causes of action, but do not confer jurisdiction on the court.  See Curtis v. Taylor, 625 F.2d 645, 649 (5th Cir. 1980) (explaining that 42 U.S.C. § 1983 "is only remedial; it recognizes a cause of action but it does not of itself bestow jurisdiction of the action on federal courts"); Jolly v. United States, 488 F.2d 35, 36 (5th Cir. 1974) ("The Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, authorizes federal courts to provide declaratory relief; but it does not of itself confer jurisdiction on the federal courts.").

notice." <u>Lovelace v. Software Spectrum Inc.</u>, 78 F.3d 1015, 1017-18 (5th Cir. 1996).  The court must accept all of the plaintiffs' factual allegations as true and view them in the light most favorable to the plaintiffs.  <u>In re S. Scrap Material Co., LLC</u>, 541 F.3d 584, 587 (5th Cir. 2008).  All reasonable inferences should be drawn in the plaintiffs' favor.  <u>Elsensohn v. St. Tammany Parish Sheriff's Office</u>, 530 F.3d 368, 371-72 (5th Cir. 2008).

Viewing the complaint in this manner, the court must ultimately determine whether "'the complaint states any valid claim for relief.'"  <u>Collins v. Morgan Stanley Dean Witter</u>, 224 F.3d 496, 498 (5th Cir. 2000) (quoting 5 Charles Alan Wright & Arthur R. Miller, <u>Federal Practice & Procedure</u> § 1357, at 601 (1st ed. 1969)).  Mere conclusory allegations, however, are not sufficient. <u>Id.</u>  "[A] formulaic recitation of the elements of a cause of action will not do . . . ."  <u>Bell Atl. Corp. v. Twombly</u>, 127 S. Ct. 1955, 1965 (2007).  At a minimum the plaintiffs must have pleaded "enough facts to state a claim to relief that is plausible on its face." <u>Id.</u>  "Factual allegations must be enough to raise a right to relief above the speculative level . . . ."  <u>Id.</u>

## A.  Section 5 Claims

Section 5 of the VRA, codified at 42 U.S.C. § 1973c, provides that certain states and political subdivisions designated by the Attorney General under a specified coverage formula may not "enact or seek to administer any voting qualification or prerequisite to

voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1972" without first obtaining "preclearance" for the change. 42 U.S.C. § 1973c(a); City of Lockhart v. United States, 103 S. Ct. 998, 1001 (1983). Preclearance may be obtained in one of two ways: (1) instituting a declaratory judgment action in the United States District Court for the District of Columbia ("USDCDC"), or (2) submitting the proposed change to the Attorney General of the United States for approval. 42 U.S.C. § 1973c(a); Lockhart, 103 S. Ct. at 1001.

> "A change will be precleared only if it 'neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color, or [because of membership in a language minority group].' An election practice has the 'effect' of 'denying or abridging the right to vote' if it 'lead[s] to a retrogression in the position of racial [or language] minorities with respect to their effective exercise of the electoral franchise.'"

Riley v. Kennedy, 128 S. Ct. 1970, 1977 (2008) (quoting 42 U.S.C. § 1973c(a); Beer v. United States, 96 S. Ct. 1357, 1364 (1976)) (citation omitted) (alteration in original).

The state of Texas was designated by the Attorney General as a covered jurisdiction in 1975. Lockhart, 103 S. Ct. at 1001 (citing 40 Fed. Reg. 43,746 (1975)). The City of Houston, as a municipality in Texas, is therefore subject to § 5's preclearance requirements. See City of Rome v. United States, 100 S. Ct. 1548, 1556 (1980) (holding that the City of Rome was subject to § 5's preclearance requirements "because it is a political unit in a

covered jurisdiction, the State of Georgia" (citing <u>United States</u> <u>v. Bd. of Comm'rs of Sheffield</u>, 98 S. Ct. 965 (1978))).

The plaintiffs assert that the City of Houston has made two changes to "standard[s], practice[s], or procedure[s] with respect to voting," 42 U.S.C. § 1973c(a), for which it has not obtained preclearance. In a case such as this where the plaintiffs allege that the defendant jurisdiction has failed to preclear certain changes, the court may only consider three issues: (1) whether § 5 covers the alleged changes, (2) whether § 5's preclearance requirements were satisfied, and (3) if the requirements were not satisfied, what remedy is appropriate. <u>E.g.</u>, <u>Lopez v.</u> <u>Monterey County</u>, 117 S. Ct. 340, 349 (1996); <u>Lockhart</u>, 103 S. Ct. at 1001 n.3. The defendants admit that the city has not obtained preclearance for these alleged "changes" from the Attorney General or the USDCDC. They assert that preclearance is not required because no changes subject to § 5 have been made.

The VRA generally requires that such "disputes involving the coverage of § 5 be determined by a district court of three judges." <u>Allen v. State Bd. of Elections</u>, 89 S. Ct. 817, 830 (1969). <u>See also</u> 42 U.S.C. § 1973c(a) ("Any action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28 . . . ."). If, however, the plaintiffs' "§ 5 claims are 'wholly insubstantial' and completely without merit, such as where the claims are frivolous, essentially fictitious, or determined by

-14-

prior case law, a single judge may dismiss the claims without convening a three-judge court." LULAC v. Texas, 113 F.3d 53, 55 (5th Cir. 1997) (citing St. Landry Parish Sch. Bd., 601 F.2d at 863; Broussard v. Perez, 572 F.2d 1113, 1118 (5th Cir. 1978); Carr v. Edwards, No. 94-1280, 1994 WL 419856, at *3 n.3 (E.D. La. Aug. 8, 1994)).

    1.   Alleged Changes

The plaintiffs first assert that the City Council has changed the standard for triggering Article V, § 2's mandate to increase the size of the Council from fourteen to sixteen members. They contend that the 1979 Charter amendments established that the size of the Council must be increased upon "any determination . . . pursuant to this Charter" that the population of Houston is at or above 2.1 million people. City of Houston Charter, art. V, § 2 (emphasis added). The plaintiffs allege that the City Controller has recently made a determination pursuant to Article VI-a, § 7 of the Charter that the city's population exceeds 2.1 million people, thereby triggering Article V, § 2's mandate to increase the size of the Council. The plaintiffs assert that the Council, by subsequently refusing to add two new single-member Council positions, has effectively implemented a new standard or policy that only its population determination pursuant to Article V, § 3 of the Charter can trigger Article V, § 2's mandate to increase the size of the Council. The plaintiffs argue that the implementation of this new standard requires preclearance under § 5.

-15-

The plaintiffs also assert that the City Council has changed its procedure for making its population determinations under Article V, § 3 of the Charter.  According to the plaintiffs, Article V, § 3 requires the Council to make its population determination "based upon the best available data, including, but not limited to, the most recent federal census."  City of Houston Charter, art. V, § 3.  The plaintiffs contend that by relying solely on data from the 2000 federal census to make its population determination for 2009, the City Council has disregarded the "best available data," and has implicitly changed its practice or procedure for determining the population.  The plaintiffs assert that this change also requires preclearance under § 5 of the VRA.[20]

2.  <u>Setting the Baseline</u>

In order to determine whether a change in voting subject to § 5 has occurred, the challenged practice must be compared to a

_____

[20]The defendants understand Plaintiffs' First Amended Complaint (Docket Entry No. 24) also to allege a third change.  Specifically, the defendants interpret the complaint to assert that the City Charter mandates an increase to sixteen members, and that by refusing to implement the increase, the city has effectively made a change in the size of the Council, reducing it from the required sixteen members back to the original fourteen members.  <u>See</u> Defendants' Reply Brief in Support of Its Motion to Dismiss, Docket Entry No. 28, at 3-9.  The plaintiffs, however, deny that they are alleging such a change.  In their Response to Defendants' Supplemental Motion to Dismiss, the plaintiffs state that they "do not argue that the size of the City Council has changed.  Plaintiffs instead allege deviations from the practices and standards actually used in determining when the size of the City Council must be changed."  Plaintiffs' Response to Defendants' Supplemental Motion to Dismiss, Docket Entry No. 29, at 1.

-16-

"baseline." <u>Kennedy</u>, 128 S. Ct. at 1982.  The baseline is defined "as the most recent practice that was both precleared and 'in force or effect' -- or, absent any change since the jurisdiction's coverage date, the practice that was 'in force or effect' on that date."  <u>Id.</u> (citing <u>Young v. Fordice</u>, 117 S. Ct. 1228, 1234-35 (1997)).

        i.   First Alleged Change

    For the first alleged change the plaintiffs assert that the applicable baseline is the standard stated in Article V, § 2, as amended in 1979:   "any determination . . . pursuant to this Charter" that the city's population is greater than or equal to 2.1 million people.[21]   City of Houston Charter, art. V, § 2.  More precisely, they assert that the baseline is their interpretation of this provision, under which the City Controller's annual population determination under Article VI-a, § 7 falls within the scope of the "any determination" language.   The defendants challenge the plaintiffs' interpretation of the Charter, asserting that when Article V, §§ 2 and 3 of the City Charter are read together, it is

---

        [21]The parties agree that the city obtained preclearance pursuant to § 5 of the Voting Rights Act from the Attorney General of the United States for the 1979 amendments to the City Charter. <u>See</u> Plaintiffs' First Amended Complaint, Docket Entry No. 24, ¶¶ 28-29; Brief in Support of Defendants' Motion to Dismiss, Docket Entry No. 5, at 6 n.5.  <u>See also</u> <u>Leroy v. City of Houston</u>, 831 F.2d 576, 578-79 (5th Cir. 1987) (describing the Attorney General's preclearance of Houston's adoption in 1979 of its current "mixed single-member and at-large voting plan," and the districting for the plan).

clear that the "any determination" language refers only to the population determination made by the Council under Article V, § 3. They further contend that the "any determination" language in Article V, § 2, adopted in 1979, could not possibly refer to a population determination under Article VI-a, § 7, which was adopted twenty-five years later in 2004.  Lastly, the defendants assert that the determination made by the City Controller under Article VI-a, § 7 is not a determination of the population of the city, but instead is a determination of the percentage change in the city's population.

The court need not resolve the parties' dispute over the proper interpretation of the City Charter because, under applicable precedent, the proper interpretation of the Charter is irrelevant for determining the baseline.  The baseline for § 5 purposes is not based on what the governing law requires.  Instead, it is to be determined from the practice or standard actually followed by the defendant jurisdiction.  <u>Lockhart</u>, 103 S. Ct. at 1003 (explaining that "[t]he proper comparison is between the new system and the [old] system actually in effect," even if the old system was not the system required by applicable state law); <u>Perkins v. Matthews</u>, 91 S. Ct. 431, 440 (1971) (holding that the proper baseline was "the procedure <u>in fact</u> 'in force or effect,'" not the procedure mandated by applicable state law (emphasis added)); <u>LULAC</u>, 113 F.3d at 55 ("[I]n determining whether a voting change has occurred, a

court must look to the state's actual practices, not to what those practices should have been under a correct application of the state's voting law.").[22]

The plaintiffs have failed to allege that the City of Houston has ever actually implemented or followed the standard that they assert is the baseline.  In fact, the City could not have done so, for it is undisputed that since Article V was amended in 1979, the City Council has not increased the number of Council positions. Only if the City had actually increased the size of the Council upon a determination by the City Controller or some other determination "pursuant to th[e] Charter," City of Houston Charter, art. V, § 2, that the population had surpassed 2.1 million people could it be said that the plaintiffs' interpretation of the Charter was "in force or effect" under applicable Supreme Court precedent. See Lockhart, 103 S. Ct. at 1003; Perkins, 91 S. Ct. at 440.

---

[22]In Riley v. Kennedy, 128 S. Ct. 1970 (2008), and Young v. Fordice, 117 S. Ct. 1228 (1997), the Supreme Court recognized exceptions to the Perkins/Lockhart rule by holding that voting practices that had actually been implemented should not be considered part of the § 5 baseline in certain situations.  See Kennedy, 128 S. Ct. at 1984-86 (holding that an election practice temporarily put into effect but soon thereafter declared unconstitutional by the Alabama Supreme Court was never in force or effect); Young, 117 S. Ct. at 1235 (holding that an election practice actually implemented for a brief period due to a "temporary misapplication of state law" was never in force or effect).  Importantly, however, the Court has never held that a practice mandated by law, but not actually implemented, could be considered to be in force or effect for § 5 baseline purposes.  It is clear from Perkins, Lockhart, Young, and Kennedy that a voting practice must be actually implemented before it can be eligible for inclusion in the § 5 baseline.

Because the plaintiffs have failed to allege a baseline standard or practice that was actually in effect different from the alleged "new" standard or practice, they have failed to state a claim under § 5 of the VRA.

Moreover, even if the court were to accept _arguendo_ the plaintiffs' argument that the City had changed its standard for determining when Article V, § 2's mandate to increase the size of the Council is triggered, the plaintiffs have still failed to state a valid § 5 claim.  As the court will explain below in Part III.A.3, the standard for determining when to increase the size of the Council is not a "standard, practice, or procedure <u>with respect to voting</u>," and thus a change in that standard is not subject to § 5.  42 U.S.C. § 1973c(a) (emphasis added).

### ii.  Second Alleged Change

For the second alleged change the plaintiffs similarly assert that the baseline practice or procedure is established by the text of the City Charter.  Specifically, the plaintiffs contend that the baseline procedure for the City Council's population determinations made under Article V, § 3 of the Charter involves the use of "the best available data, including, but not limited to, the most recent federal census."  City of Houston Charter, art. V, § 3.  The plaintiffs contend that the Council's 2009 population determination was not based on the "best available data" because the Council based its determination only on data from the 2000 federal census.

-20-

Again, the plaintiffs erroneously rely on the City Charter rather than the past actual practice of the City Council to establish the § 5 baseline.  As explained above, in setting the baseline, the "court must look to the [city's] actual practices, not to what those practices should have been under a correct application of the [City Charter]."[23]  LULAC, 113 F.3d at 55.  The defendants correctly note that the plaintiffs have failed to allege in their complaint what, if any, data other than the most recent federal census the City Council has actually used in past years when making the population determination under Article V, § 3.  In response the plaintiffs argue that its complaint "implies that City Council was actually using the best available data and actually was not limiting itself to the most recent federal census."[24]  In order to survive a 12(b)6 motion, however, "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ."  Twombly, 127 S. Ct. 1955, 1965 (2007).[25]  The plaintiffs'

_____

[23]Using the Charter language as a baseline would be particularly problematic for this alleged change because to do so would require the court to definitively interpret the phrase "best available data" and determine which, if any, data other than data from the 2000 census qualifies as "best available data."  The Lockhart Court noted that it "doubt[ed] that Congress intended to force [the Attorney General or the District Court] into speculation as to state law" when applying § 5.  Lockhart, 103 S. Ct. at 1003 n.8.  By following precedent and looking only to the City Council's actual practices in setting the baseline, the court avoids having to speculate as to the correct interpretation of the Charter.

[24]Plaintiffs' Response to Defendants' Supplemental Motion to Dismiss, Docket Entry No. 29, at 8.

[25]See also Ashcroft v. Iqbal, 129 S. Ct. ___, No. 07-1015,2009 WL 1361536, *13 (May 18, 2009) (explaining that a complaint fails to stare a claim "where the well-pleaded facts do not permit the
(continued...)

factual allegations as to the appropriate § 5 baseline fail to do so.

Moreover, even were the court to construe the plaintiffs' complaint to adequately allege that the City Council has in previous years actually relied on data other than the most recent federal census in making its population determinations under Article V, § 3 of the City Charter, the plaintiffs have still failed to state a viable § 5 claim.  As the court will explain below, merely changing the information relied upon or changing the procedure for determining whether a change in the size of the City Council is required is not the type of change that is subject to § 5's preclearance requirements.

### 3.   Analyzing the Alleged Changes

Section 5 of the VRA only applies to changes in "standard[s], practice[s], or procedure[s] with respect to voting."  42 U.S.C. § 1973c(a) (emphasis added).  In Presley v. Etowah County Comm'n, 112 S. Ct. 820, 828 (1992), the Supreme Court reviewed its prior decisions involving § 5 of the VRA and described four categories of changes that it has recognized as covered by § 5.  These categories are:  (1) "changes involv[ing] the manner of voting," id. (citing, e.g., Perkins, 91 S. Ct. at 436 (change in location of polling place)), (2) changes "involv[ing] candidacy requirements and qualifications," id. (citing, e.g., NAACP v. Hampton County

---

[25](...continued)
court to infer more than the mere possibility of misconduct" (emphasis added)).

Election Comm'n, 105 S. Ct. 1128 (1985) (change in filing
deadline); Hadnott v. Amos, 89 S. Ct. 1101 (1969) (same); Dougherty
County Bd. of Ed. v. White, 99 S. Ct. 368 (1978) (change in rule
requiring board of education members to take unpaid leave of
absence while campaigning for office)), (3) "changes in the
composition of the electorate that may vote for candidates for a
given office," id. (citing, e.g., Perkins, 91 S. Ct. at 439-440
(change from ward to at-large elections); Perkins, 91 S. Ct. at 437
(changes in boundary lines of voting districts); City of Richmond
v. United States, 95 S. Ct. 2296 (1975) (same)), and (4) "changes
. . . affecting the creation or abolition of an elective office,"
id. (citing, e.g., McCain v. Lybrand, 104 S. Ct. 1037 (1984)
(appointed officials replaced by elected officials); Lockhart, 103
S. Ct. 998 (increase in number of city councilors)).  Summarizing
the categories of covered changes, the Court explained "each has a
direct relation to voting and the election process."  Id. at 829
(emphasis added).

Neither of the plaintiffs' alleged changes fit within any of
the four categories of covered changes listed in Presley.  As for
the first and second categories, the alleged changes do not even
arguably relate to the manner of voting or candidacy requirements.
See id. at 828.  As for the third and fourth categories, the
alleged changes come a little closer, but, at most, could only be
said to have an indirect impact on the composition of the
electorate that may vote for candidates for a given office and/or
the creation of new elective offices.

Expanding the number of council positions would clearly fit within the fourth category, and redistricting would fit within the third category.  See id. at 828 (citing Perkins, 91 S. Ct. at 437 (change in boundary lines of voting districts); Lockhart, 103 S. Ct. 998 (increase in number of city councilors)).  But merely changing the standard or information used to determine when the expansion of the Council and the concomitant redistricting must be implemented does not have the requisite "direct relation to voting and the election process" to be subject to § 5 preclearance.[26]  Id. at 829.

---

[26]If § 5's preclearance requirement were not limited to changes that directly affect voting, the Attorney General or the USDCDC would indeed face a formidable task.  Preclearance involves a determination that the proposed change results in a system that is no more dilutive of minority votes than the system that it replaced.  Reno v. Bossier Parish Sch. Bd. [Bossier II], 120 S. Ct. 866, 875 (2000).  Therefore, obtaining preclearance for the changes challenged in this case would require the Attorney General or the USDCDC to determine (1) whether looking only to data from the 2000 census to determine the population of Houston is more or less dilutive of minority votes than looking to other sources of data, and (2) whether expanding the City Council upon "any determination" made under the City Charter that the population of Houston exceeds 2.1 million people is more or less dilutive of minority votes than expanding the Council only upon a determination by the Council itself that the population exceeds 2.1 million people.  Answering these questions would require the Attorney General or the USDCDC to make many speculative assumptions about when and how an expanded Council and the concomitant redistricting might be implemented under both the alleged baseline practices and the "new" practices.  Contrast this complicated and abstract analysis with the relatively straightforward inquiry required for changes that directly affect voting.  For example, if the City Council were actually expanded or if districts were actually redrawn, the pertinent questions would be (1) whether the larger sixteen-member council is more or less dilutive of minority votes than the existing fourteen-member council, or (2) whether the proposed set of district boundaries is more or less dilutive of minority votes than the existing set of district boundaries.  For these inquiries, the unknowns and required assumptions are far fewer.

The changes challenged by the plaintiffs are similar to those held to be outside the scope of § 5 by a three-judge court in this district in Barrientos v. Texas, 290 F. Supp. 2d 740 (S.D. Tex. 2003), in that, at most, they have the potential to indirectly affect voting and elections. The plaintiffs in Barrientos asserted that the Texas Legislature had made two changes subject to § 5 of the VRA for which it had failed to obtain preclearance. Barrientos, 290 F. Supp. 2d at 741. First, the plaintiffs challenged the Legislature's decision to consider congressional redistricting legislation -- something usually done only once per decade, after each federal census -- even though a redistricting plan had already been implemented for the last federal census in 2000. Id. Second, the plaintiffs challenged a declaration by the Lieutenant Governor that the redistricting legislation would be considered by the Legislature in a special session in which the so-called "2/3 rule" -- apparently an internal rule of procedure normally followed by the Texas Senate -- would not apply.  Id.

Relying on Presley, the court considered whether these changes directly affected voting.  Id.  The court explained that "what will directly affect the voters of this State is a redistricting bill, not the mere consideration of such a bill or the process by which it comes to the floor of the Texas Senate."  Id.  Because the challenged changes only indirectly affected voting, the court concluded they were outside the scope of § 5.  Id.

Similarly, in this case, what would directly affect the voters of Houston is the actual expansion of the City Council and the associated redistricting, not the procedure or standard for determining when Council expansion and redistricting is required. Although the changes challenged by the plaintiffs "may indirectly affect voting, they are not within the scope of [§ 5 of the VRA]." Id.[27]

---

[27]The plaintiffs argue that Barrientos is distinguishable in four ways.  See Plaintiffs' Response to Defendants' Supplemental Motion to Dismiss, Docket Entry No. 29, at 5 n.1.  First they argue that in Barrientos, and not in this case, the Department of Justice ("DOJ") had made an affirmative conclusion that no change had occurred.  See Barrientos, 290 F. Supp. 2d at 741.  Although the DOJ's determination supported the court's holding in Barrientos, it was not outcome determinative.  The court clearly stated that it was not bound by the DOJ's determination.  Id.  Second, the plaintiffs argue that Barrientos involved only "changes in the routine organization and functioning of government," id. (quoting Presley, 112 S. Ct. at 829), but that this case involves changes directly affecting voting because alleged changes are "obviously linked to the increase in the number of members of the City Council."  Plaintiffs' Response to Defendants' Supplemental Motion to Dismiss, Docket Entry No. 29, at 5 n.1.  The alleged changes in this case are no more closely linked to the expansion of the City Council than the procedural changes challenged in Barrientos were linked to redistricting.  Just because a certain change is linked to another change that has a direct effect on voting does not mean that that certain change also has a direct effect on voting.  The alleged link establishes nothing more than an indirect effect on voting.  In this case, only the actual increase in the number of Council members would have the requisite direct effect on voting, but that has not yet occurred.  Third, the plaintiffs assert that in Barrientos a final enactment of changes that directly affected voting had not occurred, whereas here, the plaintiffs' complaint asserts that final decisions have been made regarding the challenged changes.  This distinction also fails, for it incorrectly assumes that the challenged changes directly affect voting.  As the court has already concluded, they do not.  As in Barrientos, it is undisputed that changes that will directly affect

(continued...)

4.   <u>28 C.F.R. § 51.14</u>

Although the changes that the plaintiffs challenge do not directly affect voting, the plaintiffs nevertheless argue that the alleged changes are covered by § 5 pursuant to a regulation promulgated by the Attorney General to provide guidelines for administering § 5.   If the regulation is applicable, it "is entitled to considerable deference."   <u>Hampton County Election Comm'n</u>, 105 S. Ct. at 1135.

The plaintiffs rely on 28 C.F.R. § 51.14.   This regulation, entitled "Recurrent practices," provides:

> Where a jurisdiction implements a practice or procedure periodically or upon certain established contingencies, a change occurs:  (a) The first time such a practice or procedure is implemented by the jurisdiction, (b) when the manner in which such a practice or procedure is implemented by the jurisdiction is changed, or (c) when the rules for determining when such a practice or procedure will be implemented are changed.   The failure of the Attorney General to object to a recurrent practice or procedure constitutes preclearance of the future use of the practice or procedure if its recurrent nature is clearly stated or described in the submission or is expressly recognized in the final response of the Attorney General on the merits of the submission.

28 C.F.R. § 51.14 (2008).

---

[27](...continued)
voting, such as actually expanding the City Council or redistricting, have not yet been enacted.   Fourth, the plaintiffs contend that <u>Barrientos</u> was decided by a three-judge court, not by a single judge.   <u>Barrientos</u> was indeed decided by a three-judge court, but that in no way affects the fact that the changes that plaintiffs challenge do not directly affect voting.   Moreover, <u>Barrientos</u> reinforces the court's conclusion that the plaintiffs' § 5 claims are "'wholly insubstantial' and completely without merit," <u>LULAC</u>, 113 F.3d at 55, such that a three-judge court is not required to dismiss them.

The plaintiffs contend that expanding the City Council to sixteen members is a practice or procedure that is implemented "upon certain established contingencies," and thus falls within the ambit of this regulation.   Id.   The plaintiffs argue that the alleged changes made by the City Council amount to changes in "the manner in which such a practice or procedure is implemented" or to changes in "the rules for determining when such a practice or procedure will be implemented."   Id.

The language of the regulation arguably could be interpreted to apply to the changes alleged by the plaintiffs.  A closer look at the history and purpose of 28 C.F.R. § 51.14, however, reveals that it was not intended to apply to one-time changes in voting practices or procedures such as the expansion of the Houston City Council to sixteen members.  Instead, it was intended only to apply to recurrent practices or procedures.

When the Attorney General proposed this regulation in 1980, its stated purpose was to "explain the application of Section 5 to recurrent practices."  Procedures for the Administration of Section 5 of the Voting Rights Act of 1965:  Proposed Revision of Procedures, 45 Fed. Reg. 18,890 (Mar. 21, 1980) (emphasis added).[28]

_____

[28]The regulation was originally promulgated at 28 C.F.R. § 51.13.  See 45 Fed. Reg. at 18,892.  It was redesignated as 28 C.F.R. § 51.14 in 1987.  See Procedures for the Administration of Section 5 of the Voting Rights Act of 1965:  Proposed Revisions of Procedures, 50 Fed. Reg. 19,122, 19,123 (May 6, 1985) (proposing revisions, including redesignation of 28 C.F.R. § 51.13 as 28 (continued...)

Upon adopting the final rule the Attorney General further explained that

> [i]t is hoped that § 51.1[4] will result in the reduction of submissions made unnecessarily.  For example, a county which always conducts voter registration at extra locations prior to elections does not have to make a submission prior to each election; a submission would be required only when the practice is first instituted or is changed.

Procedures for the Administration of Section 5 of the Voting Rights Act of 1965:  Revision of Procedures, 46 Fed. Reg. 870, 871 (Jan. 5, 1981).  Because the change in the number of City Council members will only occur once, 28 C.F.R. § 51.14 does not apply and does not suggest that the alleged changes in the procedures or standards for triggering the expansion of the Council are subject to § 5.[29]

5.   <u>Conclusion</u>

The plaintiffs have failed to state a claim for which relief can be granted under § 5 of the VRA.  Furthermore, for the reasons

---

[28](...continued)
C.F.R. § 51.14); Revision of Procedures for the Administration of Section 5 of the Voting Rights Act of 1965, 52 Fed. Reg. 486, 492 (Jan. 6, 1987) (adopting final rule).

[29]Even if the alleged changes fall within the scope of the regulation, the court need not defer to the Attorney General's interpretation in this case.  As the Supreme Court explained in <u>Presley</u>, "§ 5 is unambiguous with respect to the question whether it covers changes other than changes in rules governing voting:  It does not."  <u>Presley</u>, 112 S. Ct. at 832.  Therefore, to the extent that a regulation promulgated by the Attorney General "suggests the contrary," it "is not entitled to deference."  <u>Id.</u>  Because the court has already concluded that the changes challenged by the plaintiffs do not "bear a direct relation to voting itself," they are beyond the scope of § 5, 28 C.F.R. § 51.14 notwithstanding. <u>Id.</u>

stated above, the court concludes that the plaintiffs' § 5 claims are foreclosed by prior case law or are otherwise "'wholly insubstantial' and completely without merit." LULAC, 113 F.3d at 55. Therefore, the court will dismiss them without convening a three-judge court.

## B.   Section 2 Claim

### 1.   Section 2 of the VRA

Section 2 of the VRA, codified at 42 U.S.C. § 1973, prohibits the imposition of any

> voting qualification or prerequisite to voting or standard, practice, or procedure . . . by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or [on account of membership in a language minority group].

42 U.S.C. § 1973(a). The statute further provides that this prohibition has been violated if "the totality of the circumstances" indicate that "the political processes leading to nomination or election . . . are not equally open to participation by members of a [protected class] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." Id. § 1973(b).[30]   Section 2, however, does not

---

[30]Paragraph (b) was added to § 2 by Congress in 1982 "to restore the 'results test' -- the legal standard that governed voting discrimination cases prior to [the Court's] decision in Mobile v. Bolden," 100 S. Ct. 1490 (1980). Gingles, 106 S. Ct. at 2763 n.8 (citing S. Rep. No. 97-417, at 15-16). Under the "results
(continued...)

"establish[] a right to have members of a protected class elected in numbers equal to their proportion in the population." Id. "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives." Thornburg v. Gingles, 106 S. Ct. 2752, 2764 (1986).

To prove that § 2 has been violated, a plaintiff must first show that an allegedly disadvantaged "minority group . . . is sufficiently large and geographically compact to constitute a majority in a single-member district." Id. at 2766. Second, the plaintiff must show that "the minority group . . . is politically cohesive." Id. Third, the plaintiff must demonstrate that "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." Id. at 2766-67. If the plaintiff can establish these pre-conditions, the court must then evaluate the challenged voting practice and determine "whether the totality of the circumstances supports a finding of liability." Holder v. Hall, 114 S. Ct. 2581, 2585 (1994) (plurality op.).

---

[30](...continued)
test," a plaintiff can prevail on a § 2 claim by showing only that "a challenged election law or procedure ha[s] the effect of denying a protected minority an equal chance to participate in the electoral process." Id. (citing S. Rep. No. 97-417, at 16) (emphasis added). Plaintiffs "are not required to demonstrate that the challenged electoral law or structure was designed or maintained for a discriminatory purpose." Id.

In order to conduct the required analyses the court must be able to identify "a reasonable alternative practice as a benchmark against which to measure the existing voting practice." Id. Only by comparing the challenged practice to a reasonable alternative benchmark can the court be sure that the minority group in question could fare better under a different system, and thus, that the group is, in fact, disadvantaged under the current system. See Holder, 114 S. Ct. at 2585-86 ("[A] court must have an idea in mind of how hard it should be for minority voters to elect their preferred candidates under an acceptable system." (quoting Gingles, 106 S. Ct. at 2786 (O'Connor, J., concurring in judgment))); Gingles, 106 S. Ct. at 2766 n.17 ("Unless minority voters possess the potential to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice."). In some cases, however, "there is no objective and workable standard for choosing a reasonable benchmark . . . ." Holder, 114 S. Ct. at 2586. In such circumstances, "the voting practice cannot be challenged as dilutive under § 2." Id.

### 2.   The Plaintiffs' § 2 Allegations

The plaintiffs allege that the defendants have violated § 2 by "employ[ing] voting practices and procedures that enhance the discriminatory effects of the single-member and at-large election

methods."[31]  More specifically, they allege that "[t]he purpose and result of the refusal of [the defendants] to increase the number of council members from fourteen to sixteen is to minimize or cancel out the voting potential of Hispanics and Blacks."[32]  Therefore, the specific voting practice of which the plaintiffs complain is the maintenance of a fourteen-member City Council.

The plaintiffs assert that the appropriate benchmark against which to measure the current fourteen-member Council, made up of five at-large positions and nine single-member district positions, is a sixteen-member Council with eleven single-member district positions and five at-large positions as prescribed by Article V, § 2 of the Houston City Charter.[33]  They contend that Article V, § 2 of the City Charter, which requires that the Council be increased from fourteen to sixteen members when the population of Houston meets or exceeds 2.1 million people, provides a "principled reason" for selecting a sixteen-member Council as a benchmark.[34]

3.    _Holder_ and _McDonald_

The defendants argue that the plaintiffs' § 2 claims are precluded by the Supreme Court's decision in Holder v. Hall, 114

---

[31]Plaintiffs' First Amended Complaint, Docket Entry No. 24, ¶ 74.

[32]Id. ¶ 76.  The plaintiffs have not made sufficient allegations to even begin to satisfy the Gingles preconditions with regard to Black voters.  The plaintiffs' factual allegations in paragraphs 64 to 73 of their First Amended Complaint relate only to Hispanic voters.  See id. at ¶¶ 64-73.

[33]See id. ¶ 75.

[34]Id.

S. Ct. 2581 (1994).   In <u>Holder</u> the Court considered a claim
asserting that the county commission of Bleckly County, Georgia,
violated § 2 of the VRA because it was made up of only a single
commissioner.   <u>See</u> <u>Holder</u>, 114 S. Ct. at 2584-85.   The plaintiffs
alleged that this single-commissioner system prevented black voters
from having an equal opportunity to elect their preferred
representative.   <u>See</u> <u>id.</u>   A plurality of three Justices -- Justice
Kennedy, Justice O'Connor, and Chief Justice Rehnquist -- concluded
that "a plaintiff cannot maintain a § 2 challenge to the size of a
government body," thereby rejecting the plaintiffs' § 2 claim.   <u>Id.</u>
at 2588.   The plurality reached this conclusion because, in its
view, there was no principled way to choose a benchmark -- a
different, hypothetical, reasonable size for the government body in
question -- against which to compare the current size of the body.
<u>Id.</u> at 2586, 2588.   According to the plurality, "[t]he wide range
of possibilities makes the choice [of a benchmark] <u>inherently</u>
standardless."   <u>Id.</u> at 2588 (internal quotation marks and citation
omitted) (emphasis added).

Justice O'Connor wrote a concurring opinion in which she
"agree[d] . . . that a plaintiff cannot maintain a § 2 vote
dilution challenge to the size of a governing authority."   <u>Id.</u>
(O'Connor, J., concurring).   She wrote separately, however, to
highlight her agreement with the dissenters that the size of a
governing body is a "standard, practice, or procedure" under § 2.
<u>See</u> <u>id.</u> at 2588-89.   She made clear that her concurrence with the

-34-

plurality that the size of a governing body was unchallengeable under § 2 rested solely on the absence of a principled way to select a benchmark against which to compare the challenged practice.  <u>See</u> <u>id.</u> at 2589.  Importantly, she explained that "[t]his case presents the question whether, in a § 2 dilution challenge to size [of a government body], there can <u>ever</u> be an objective alternative benchmark for comparison. . . . I agree with Justice Kennedy that there cannot be." <u>Id.</u> (emphasis added).

Justice Thomas, joined by Justice Scalia, concurred in the judgment and authored a separate opinion.  Justice Thomas explained that he interpreted § 2 to prohibit only "state enactments that limit citizens' access to the ballot." <u>Id.</u> at 2592 (Thomas, J., concurring in judgment).  Because the size of a governing body does not limit citizens' access to the ballot, Justice Thomas "agree[d] with Justices Kennedy and O'Connor that the size of a governing body cannot be attacked under § 2." <u>Id.</u> at 2591.

"When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as the position taken by those Members who concurred in the judgment on the narrowest grounds . . . .'" <u>Marks v. United States</u>, 97 S. Ct. 990, 993 (1977) (quoting <u>Gregg v. Georgia</u>, 96 S. Ct. 2909, 2923 n.15 (1976)).  The position taken by all five Justices who concurred in the judgment in <u>Holder</u> could be viewed as equally narrow in the sense that all agreed that "a plaintiff cannot maintain a § 2 challenge to the

size of a government body," albeit for various reasons.  Holder,
114 S. Ct. at 2588 (plurality op.); see also id. at 2588
(O'Connor, J., concurring) ("I agree . . . that a plaintiff cannot
maintain a § 2 vote dilution challenge to the size of a governing
authority . . . ."); id. at 2591 (Thomas, J., concurring in
judgment) ("I agree . . . that the size of a governing body cannot
be attacked under § 2 . . . ."). Alternatively, Justice Kennedy
and Justice O'Connor's position could be viewed as narrower than
Justice Thomas's -- and thus as the holding -- because they
concluded that the size of the government body was immune from
challenge only because no reasonable benchmark could be identified,
see id. at 2583-88 (Kennedy, J., plurality op.); id. at 2588-91
(O'Connor, J., concurring), whereas Justice Thomas would have more
broadly held that the size of a government body was not even a
"'standard, practice, or procedure' within the terms of the
[VRA]."[35] Id. at 2591 (Thomas, J., concurring in judgment).  Either
way, the holding of the case is that the size of a government body
cannot be challenged under § 2 of the VRA.

    Nevertheless, as the plaintiffs point out,[36] the Fifth Circuit
has not interpreted Holder to categorically bar all § 2 challenges

-------

    [35]Justice O'Connor concluded that the size of the government
body is a "standard, practice, or procedure" under § 2.  See
Holder, 114 S. Ct. at 2588-89 (O'Connor, J., concurring).  Justice
Kennedy, joined by Chief Justice Rehnquist, did not explicitly
decide the question.  See id. at 2583-88 (Kennedy, J., plurality
op.).  Both Justices Kennedy and O'Connor agreed, however, that the
outcome of the case turned on the impossibility of selecting a
workable benchmark.

    [36]See Plaintiffs' Response to Defendants' Supplemental Motion
to Dismiss, Docket Entry No. 29, at 9.

to the size of a government body.    In <u>Concerned Citizens for
Equality v. McDonald</u>, 63 F.2d 413 (5th Cir. 1995), the Fifth
Circuit considered a § 2 challenge to the "four-precinct, single-
member structure used to elect Constables and Justices of the Peace
in Orange County," Texas.    <u>McDonald</u>, 63 F.2d at 414.    The
plaintiffs alleged that the four-precinct system impermissibly
diluted black voting strength, but that it could be cured by the
addition of a fifth single-member precinct.    <u>Id.</u>   Referring to
<u>Holder</u>, the <u>McDonald</u> court stated, "[a] five justice majority of
the Supreme Court concluded that a voting rights plaintiff cannot
maintain a § 2 challenge to the size of a governmental body unless
an 'objective and workable standard for choosing a benchmark by
which to evaluate a challenged voting practice' can be
identified."[37]    <u>Id.</u> at 416 (citing <u>Holder</u>, 114 S. Ct. at 2588).   The
<u>McDonald</u> court stated, "[i]n <u>Holder</u>, the Supreme Court observed
that if a 'benchmark' . . . can be identified, a voting rights
plaintiff <u>may</u> challenge the numerical size of a governmental

---

[37]Although this court is bound by <u>McDonald</u>, the court questions
whether this statement is an accurate description of the Supreme
Courts' holding in <u>Holder</u>.   First, only the three Justices who
joined in the plurality opinion -- Justices Kennedy, O'Connor, and
Chief Justice Rehnquist -- reached their conclusion based on the
lack of an "objective and workable standard for choosing a
reasonable benchmark." <u>See</u> <u>Holder</u>, 114 S. Ct. at 2585-86.   Second,
and most importantly, the plurality did not conclude that "a voting
rights plaintiff cannot maintain a § 2 challenge to the size of a
governmental body <u>unless</u> an 'objective and workable standard for
choosing a benchmark . . . ' can be identified" as the <u>McDonald</u>
court stated.   <u>McDonald</u>, 63 F.3d at 416.   Instead, the plurality
concluded that a voting rights plaintiff cannot maintain a § 2
challenge to the size of a governmental body <u>because</u> there is no
"objective and workable standard for choosing a reasonable
benchmark." <u>Holder</u>, 114 S. Ct. at 2586, 2588.

body."[38] McDonald, 63 F.3d at 418 (emphasis added) (citing Holder, 114 S. Ct. at 2588).

Moreover, instead of rejecting the plaintiffs' claim out of hand as an impermissible § 2 claim challenging the size of a government body, the McDonald court considered whether a provision

_____

[38]The court does not agree that the Holder Court made such an observation. The Holder plurality summarized its conclusion as follows:

> With respect to challenges to the size of a governing authority, respondents fail to explain where the search for reasonable alternative benchmarks should begin and end, and they provide no acceptable principles for deciding future cases. The wide range of possibilities makes the choice "inherently standardless," . . . and we therefore conclude that a plaintiff cannot maintain a § 2 challenge to the size of a government body, such as the Bleckley County Commission.

Holder, 114 S. Ct. at 2588 (emphasis added) (citation omitted). The plurality made clear that a plaintiff can never give a principled reason why any particular size of a government body is preferable because the choice is "inherently standardless." Id. Moreover, Justice O'Connor's opinion unequivocally stated that a plaintiff may never bring a § 2 claim on the basis of the size of a governing body. See id. at 2589 ("This case presents the question whether, in a § 2 dilution challenge to size [of a government body], there can ever be an objective alternative benchmark for comparison. . . . I agree with Justice Kennedy that there cannot be." (emphasis added). Even the dissenters in Holder recognized that the decision by the five Justices concurring in the Court's judgment did not leave open the possibility of finding a workable benchmark for challenges to the size of government bodies. The dissenters conceded that "five Justices decide . . . that voting rights plaintiffs cannot bring § 2 dilution challenges based on size." Id. at 2619 (Blackmun, J., dissenting). Significantly, the dissenters criticized the plurality for imposing a "judicially created limitation on the coverage of the broadly worded statute, as enacted and amended by Congress" merely to avoid "the need to make difficult judgments." Id. at 2622 (Blackmun, J., dissenting) (quoting Chisom v. Roemer, 111 S. Ct. 2354, 2368 (1991)). This criticism would have been inapposite had the plurality decided that plaintiffs may challenge the size of a government body if a workable benchmark could be identified, but that it was not possible to do so in Holder.

of the Texas Constitution, which states that "'for the convenience
of the people,' counties with a population of 30,000 or more 'shall
be divided into not less than four and not more than eight [Justice
of the Peace] precincts,'" provided a principled reason to select
a different number of precinct -- five, six, seven, or eight -- as
a benchmark for comparison to the current four-precinct system.
McDonald, 63 F.3d at 418 (quoting Texas Constitution, art. 5, § 18)
(alteration in original).   Only after it concluded that the
constitutional provision did not provide a principled basis for
selecting a comparative benchmark did the McDonald court affirm the
district court's dismissal of the plaintiff's § 2 claim.   Id.

The McDonald court's interpretation of Holder leaves open the
possibility that a plaintiff may successfully challenge the size of
a government body under § 2 if he can identify an "objective and
workable" benchmark.[39]   Because "[i]t is well established that a

_____

[39]Other federal Courts of Appeals have not interpreted Holder
in this manner.   Instead, they have interpreted Holder to
categorically bar, without qualification or exception, § 2 claims
challenging the size of a government body.   See, e.g., Dillard v.
Baldwin County Comm'rs, 376 F.3d 1260, 1263 (11th Cir. 2004) ("[A]
plurality of the Supreme Court decided in [Holder] that a federal
court cannot modify the size of an elected governing body in order
to remedy a section 2 violation because 'there is no principled
reason why one size should be picked over another as the benchmark
for [determining whether vote dilution has occurred].'" (quoting
Holder, 114 S. Ct. at 2586) (emphasis added) (second modification
in original)); Harper v. City of Chicago Heights, 223 F.3d 593, 602
(7th Cir. 2000) ("Holder v. Hall . . . holds that the size of a
governing body is not subject to a Section 2 vote dilution claim."
(dicta)); Bradley v. Work, 154 F.3d 704, 712 (7th Cir. 1998)
(Manion, J., concurring) ("[F]ederal courts cannot change the size
of the governmental body at issue."   (citing Holder)); NAACP v.
City of Niagara Falls, 65 F.3d 1002, 1022 n.23 (2d Cir. 1995) ("In
Holder, a plurality of the [C]ourt held that a vote dilution
challenge could not be maintained under § 2 where the plaintiff was
(continued...)

federal district court must generally apply an interpretation of law articulated by its circuit court of appeals," <u>Perez v. Brown & Williamson Tobacco Corp.</u>, 967 F. Supp. 920, 925 (S.D. Tex. 1997) (citing <u>Gacy v. Welborn</u>, 994 F.2d 305, 309 (7th Cir. 1993)), the court must consider whether Article V, § 2 of the City of Houston Charter, which requires that the Council be increased from fourteen to sixteen members when the population of Houston meets or exceeds 2.1 million people, provides a "principled reason" for selecting a sixteen-member Council as a benchmark.

### 4. <u>Does the City Charter Provide an Objective and Workable Benchmark?</u>

"As the Supreme Court stated, a benchmark must be derived from an 'objective and workable standard' that allows a court 'to evaluate a challenged voting practice.'" <u>McDonald</u>, 63 F.3d at 418 (quoting <u>Holder</u>, 114 S. Ct. at 2586). In this case, the benchmark must enable the court to evaluate the "dilutive effect" of the current fourteen-member council with respect to Hispanic and/or Black votes. <u>See</u> <u>id.</u> Moreover, it must provide "a principled reason why a given number of precincts or districts is preferable to another . . . ." <u>Id.</u>

The plaintiffs suggest that a sixteen-member Council is an objective and workable benchmark for three reasons: (1) expanding to a sixteen-member Council is mandatory under the City Charter

---

[39](...continued)
challenging the size of the governing body."); <u>Nipper v. Smith</u>, 39 F.3d 1494, 1532 (11th Cir. 1994) ("[U]nder <u>Holder</u>, federal courts may not mandate as a section 2 remedy that a state or political subdivision alter the size of its elected bodies.").

once the city's population meets or exceeds 2.1 million people;[40] (2) the 1979 amendments to the City Charter, which provided for the expansion of the Council upon the population reaching 2.1 million people, were approved by the citizens of Houston and were granted preclearance by the Attorney General under § 5 of the VRA;[41] and (3) the Charter provides for an exact number of Council positions -- sixteen -- as opposed to a more indefinite range for the numerical size of the Council.[42]

The fact that expanding the Council to sixteen members is mandatory under the City Charter when the population of Houston reaches a certain threshold "tells us nothing about [the fourteen-member system's] effects on a minority group's voting strength." Holder, 114 S. Ct. at 2586.  "Surely a minority group's voting strength would be no more or less diluted had the [City Charter] not" provided for the expansion of the Council at all or had it provided for the expansion of the Council to some numerical size other than sixteen members.  Id.  Nor does the City Council's failure to implement the Council expansion, even if it is now required, provide any information "about the effects the [current fourteen-member Council] system has on the voting power of [Houston's] citizens."  Id.

---

[40]See Plaintiffs Lillie Ann Lopez and Jana Young's Memorandum in Response to Defendants' Motion to Dismiss, Docket Entry No. 25, at 8 n.4.

[41]See Plaintiffs' Response to Defendants' Supplemental Motion to Dismiss, Docket Entry No. 29, at 9-10.

[42]See id.

Similarly, the fact that the citizens of Houston approved, in 1979, an eventual expansion of the size of the City Council to sixteen members is irrelevant to the pertinent question:  whether the current fourteen-member system is dilutive of minority votes.  The voters' approval of the Council-expanding provision in the Charter in no way indicates that a fourteen-member Council somehow becomes dilutive of minority votes when the population threshold triggering the expansion is reached.

Nor is it relevant that the Attorney General precleared the 1979 amendments to the City Charter under § 5 of the VRA.  The fact that the Attorney General granted preclearance for the 1979 amendments means only that the system instituted by the amendments was "no more dilutive than" the system it replaced.  Reno v. Bossier Parish Sch. Bd. [Bossier II], 120 S. Ct. 866, 875 (2000).  It says nothing about whether, in 2009, a hypothetical sixteen-member council would be more or less dilutive of minority votes than the fourteen-member Council currently in place.

The fact that the City Charter provides for the expansion of the Council to an exact numerical size of sixteen members, as opposed to a less exact numerical range, also does not mean that a size of sixteen becomes an objective and workable standard.  While this fact may distinguish this case from McDonald, where the Texas Constitution provided only for a range of four to eight Justice of the Peace precincts per county, see McDonald, 63 F.3d at 418 ("The Texas Constitution offers no guidance whatsoever for determining

-42-

whether a covered county should have four, five, six, seven, or eight JP Precincts . . . ."), it does not distinguish this case from Holder.  In Holder Georgia state law allowed the defendant county to expand its county commission to the exact size of five members.  Holder, 114 S. Ct. at 2586.  A county commission of exactly five members was the most common form of government in other Georgia counties.  Id.  And, the defendant county had a school board of exactly five members elected from single-member districts.  Id.  Nevertheless, the plurality concluded that the plaintiffs had not provided a "convincing reason" for setting the benchmark for the numerical size of the county commission at five members.  Id.  Therefore, under Holder, just because an alternative, exact numerical size of the governing body in question can be identified on some basis does not make it a valid benchmark.

The Houston City Charter does not provide "a principled reason why a given number of precincts or districts is preferable to another . . . ." McDonald, 63 F.3d at 418.  Because the plaintiffs have failed to identify, based on an objective and workable standard, a benchmark against which to test the challenged voting practice, they cannot maintain a § 2 claim.

## C. Constitutional Claims

The plaintiffs also allege that the defendants' refusal to increase the number of City Council positions from fourteen to sixteen "was adopted and is being maintained purposefully to

dilute, minimize, and cancel out the voting strength of Blacks or Hispanics in violation of the rights of Plaintiffs secured by the Fourteenth and Fifteenth Amendments of the Constitution of the United States . . . ."[43]  To obtain relief on a vote dilution claim such as this under the Fourteenth and Fifteenth Amendments the plaintiffs must "prove that the purpose and operative effect" of the challenged election scheme "is to dilute the voting strength of [minority] citizens."[44]  Voter Information Project, Inc. v. City of Baton Rouge, 612 F.2d 208, 212 (5th Cir. 1980).  See also Davis v. Bandemer, 106 S. Ct. 2797, 2808 (1986) (plurality op.) (stating that a plaintiff alleging a violation of the Equal Protection Clause of the Fourteenth Amendment must "prove both intentional discrimination against an identifiable political group and an actual discriminatory effect on that group"); Lucas v. Townsend, 967 F.2d 549, 551 (11th Cir. 1992) ("To prevail on their claims of violations of the Fifteenth Amendment and the Equal Protection

---

[43]Plaintiffs' First Amended Complaint, Docket Entry No. 24, ¶ 83.  Although the plaintiffs do not specify which clause of the Fourteenth Amendment they base their claim on, the court assumes it is the Equal Protection Clause.

[44]Some more recent cases suggest that the Fifteenth Amendment may not be applicable to vote dilution claims.  See Bossier II, 120 S. Ct. at 875 n.3 ("[W]e have never held that vote dilution violates the Fifteenth Amendment."); Prejean v. Foster, 227 F.3d 504, 519 (5th Cir. 2000) ("[T]he Supreme Court has rejected application of the Fifteenth Amendment to vote dilution causes of action.") (citing Bossier II, 120 S. Ct. at 875 n.3).  The defendants, however, did not raise this argument; and the court need not decide the issue because the plaintiffs' Fifteenth Amendment claim fails on other grounds.

Clause of the Fourteenth Amendment, plaintiffs had to prove first that vote dilution, as a special form of discriminatory effect, exists and second, that it results from a racially discriminatory purpose chargeable to the state.") (per curiam).

The defendants point out that a claim under § 2 of the VRA requires that a plaintiff show only discriminatory effect.[45]  <u>See</u> <u>Gingles</u>, 106 S. Ct. at 2762-63.  They contend, therefore, that if the plaintiffs cannot succeed in proving a violation of § 2, with its "less rigorous" standard, then the plaintiffs <u>ipso facto</u> cannot succeed on their constitutional claims, which require them to prove "all the elements of the section 2 claim and then additionally prove discriminatory intent."[46]

The defendants do not cite, and the court was unable to identify, any decision in which a court actually held that a vote dilution claim under the Equal Protection Clause and/or the Fifteenth Amendment cannot succeed, as a matter of law, if the plaintiffs are unable to establish a violation of § 2's "less rigorous" standard.[47]  The Eleventh Circuit, however, has indicated

---

[45]Defendants' Supplemental Motion to Dismiss, Docket Entry No. 27, at 1 n.1.

[46]Defendants' Supplemental Motion to Dismiss, Docket Entry No. 27, at 1 n.1.  The plaintiffs do not contest or otherwise address this argument.  <u>See</u> Plaintiffs' Response to Defendants' Supplemental Motion to Dismiss, Docket Entry No. 29.

[47]Other district courts have similarly been unable to find definitive guidance on the issue.  <u>See, e.g.</u>, <u>Reyes v. City of</u>
(continued...)

in dicta that it believes it unlikely that a plaintiff who is unable to prove a § 2 violation could prevail on a constitutional claim challenging the same allegedly dilutive voting practice. <u>See Johnson v. DeSoto County Bd. of Comm'rs</u>, 204 F.3d 1335, 1344-45 (11th Cir. 2000) ("[W]e question, as a legal proposition, whether vote dilution can be established under the Constitution when the pertinent record has not proved vote dilution under the more permissive section 2."); <u>NAACP v. City of Opelika</u>, 748 F.2d 1473, 1478 n.7 (11th Cir. 1984) ("[I]f the plaintiffs cannot prevail under the generally more easily proved 'results' standard of section 2, it is unlikely that they could prevail on their constitutional claims in any event."). Perhaps more importantly, the court was unable to identify any case in which a court rejected a § 2 claim challenging the size of a government body based on <u>Holder</u>, but nevertheless concluded that the size of the body violated the Fifteenth Amendment or the Equal Protection Clause. <u>Cf.</u> <u>Johnson</u>, 204 F.3d at 1344 ("The parties have cited (and we have found) no case in which a circuit court has concluded that an at-large or multi-member-district electoral system, although not in violation of section 2, unconstitutionally dilutes minority voting

---

[47](...continued)
<u>Farmers Branch</u>, No. 3:07-CV-900-O, 2008 WL 4791498, *19 (N.D. Tex. Nov. 4, 2008) ("It is unclear whether a plaintiff challenging an electoral system like the system in Farmers Branch can establish a constitutional vote dilution claim where a Section 2 VRA claim has failed.").

strength."). Accordingly, and for the reasons explained below, the court concludes that, at least in this case, the plaintiffs' failure to establish a violation of § 2 forecloses the possibility of success on their constitutional claims.

    1.    <u>Section 2 Provides Greater Protection than the Equal Protection Clause and the Fifteenth Amendment</u>

Since the 1982 amendments to § 2, a successful § 2 claim has not "required proof that the contested electoral practice or mechanism was adopted or maintained with the intent to discriminate against minority voters."[48] <u>Gingles</u>, 106 S. Ct. at 2762-63. By adopting the 1982 amendments, Congress "ma[de] clear that a violation [of § 2] could be proved by showing discriminatory effect alone and . . . establish[ed] as the relevant legal standard the 'results test,' applied by this Court in <u>White v. Register</u>," 93 S. Ct. 2332 (1973). <u>Id.</u> at 2758. "Congress . . . [thereby] legislated beyond the reach of the Fifteenth Amendment . . . ." <u>Morse v. Republican Party of Virginia</u>, 116 S. Ct. 1186, 1205 n.30 (1996). Therefore, if a challenged voting practice cannot be shown

---

    [48]Prior to the 1982 amendments to § 2, § 2 was interpreted to provide the same protections provided by the Fifteenth Amendment. <u>See</u> <u>City of Mobile v. Bolden</u>, 100 S. Ct. 1490, 1496 (1980) ("[Section] 2 . . . was intended to have an effect no different from that of the Fifteenth Amendment itself."). Therefore, proving a violation of § 2 before 1982 required showing both discriminatory intent and effect. <u>See id.</u> at 1498 (explaining that the Fifteenth Amendment, and thus also § 2, "prohibits only purposefully discriminatory denial or abridgment by government of the freedom to vote 'on account of race, color, or previous condition of servitude.'").

to violate § 2, which provides greater protection than the
Fifteenth Amendment, then a fortiori that same voting practice
cannot violate the prohibitions of the Fifteenth Amendment itself.
As explained above, the plaintiffs have failed to state a valid
claim under § 2 of the VRA.  Accordingly, their Fifteenth Amendment
claim must also fail.

Similarly, § 2 provides more protection than the Equal
Protection Clause because proving a violation of the Equal
Protection Clause requires proof of "both intentional
discrimination . . . and an actual discriminatory effect . . . ."
Bandemer, 106 S. Ct. at 2808.  Therefore, the plaintiffs' failure
to state a viable § 2 claim also forecloses their ability to obtain
relief under the Equal Protection Clause.

    2.   <u>Equal Protection and Fifteenth Amendment Claims Also
Require a Reasonable and Workable Benchmark</u>

Furthermore, both logic and precedent suggest that the
identification of a reasonable benchmark against which to measure
the challenged voting practice is necessary to show the requisite
discriminatory effect for Fifteenth Amendment claims and Equal
Protection voting claims, just as it is for § 2 claims.  With
regard to the Fifteenth Amendment, in <u>Reno v. Bossier City School
Board</u> the Supreme Court explained that for both § 2 and Fifteenth
Amendment voting claims, a "comparison must be made with a
hypothetical alternative," i.e., a benchmark, to determine whether

-48-

the challenged voting practice, in fact, results in discrimination. Bossier II, 120 S. Ct. at 874.

With regard to vote dilution claims brought under the Equal Protection Clause of the Fourteenth Amendment, precedent requires the same type of comparative effects analysis. White v. Regester -- the Supreme Court case designated by Congress as the source of the "results test," i.e., "the relevant legal standard" for § 2 claims, Gingles, 106 S. Ct. at 2758; S. Rep. 97-417 at 28 -- was an Equal Protection vote dilution case. See Regester, 93 S. Ct. at 2337-41. See also Bossier II, 117 S. Ct. at 1499 (describing Regester as involving "a vote dilution challenge, brought under the Equal Protection Clause"). In Regester the Supreme Court affirmed a district court judgment ordering that multimember legislative districts in Dallas County and Bexar County, Texas, be replaced with single-member districts. Regester, 93 S. Ct. at 2339-41. Although not explicitly described as such, the single-member district system effectively served as the benchmark against which the multimember system was compared to determine that it had a discriminatory effect on racial minorities. See id.

Moreover, as a matter of logic and reasoning, it is difficult to envisage a method for determining whether a challenged election practice actually disadvantages a particular minority group other than comparing it to a benchmark. See Holder, 114 S. Ct. at 2585-86 ("[I]n order to decide whether an electoral system has [a

-49-

discriminatory effect], a court must have an idea in mind of how hard it should be for minority voters to elect their preferred candidates under an acceptable system." (quoting <u>Gingles</u>, 106 S. Ct. at 2786 (O'Connor, J., concurring))); <u>Gingles</u>, 106 S. Ct. at 2766 n.17 ("Unless minority voters possess the <u>potential</u> to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice.").

Since a benchmark is required for Equal Protection and Fifteenth Amendment vote dilution claims, the court cannot conceive of any reason why a benchmark should be chosen based on something less than an "objective and workable standard," <u>Holder</u>, 114 S. Ct. at 2586, simply because a plaintiff happens to ground his vote dilution claim in a constitutional, as opposed to a statutory, provision.   Therefore, the court concludes that the principles espoused in <u>Holder</u> and <u>McDonald</u> for selecting a benchmark are applicable not only to § 2 claims, but also to Equal Protection and and Fifteenth Amendment claims.

The court has already concluded, based on <u>Holder</u> and <u>McDonald</u>, that because the plaintiffs' § 2 claim challenges the numerical size of the Houston City Council, no objective and workable benchmark can be identified; and, therefore, no discriminatory effect can be demonstrated.  This conclusion effectively forecloses the plaintiffs' constitutional claims.

The plaintiffs' Fourteenth and Fifteenth Amendment claims are based on the same set of alleged facts and challenge the same practice -- the defendants' refusal to expand the numerical size of the City Council to sixteen positions.[49]  Accordingly, for all the same reasons explained above with regard to the plaintiffs' § 2 claim, no objective and workable benchmark can be identified for comparison with the challenged voting practice.  "There is no principled reason why one size [for the government body] should be picked over another as the benchmark . . . ."  Holder, 114 S. Ct. at 2586.  Without a workable benchmark, the plaintiffs' Fourteenth and Fifteenth Amendment claims, like their § 2 claim, fail as a matter of law.[50]

---

[49]See Plaintiffs' First Amended Complaint, Docket Entry No. 24, ¶¶ 64-76, 79-83.

[50]The fact that the Supreme Court, in Holder, remanded the case for the adjudication of the plaintiffs' constitutional claims after holding that their § 2 claims failed for lack of a workable benchmark, see Holder, 114 S. Ct. at 2588, does not suggest that the Holder plaintiffs' constitutional claims were not foreclosed by the Court's holding as to their § 2 claims.  See Johnson, 204 F.3d at 1344 n.19 ("In Holder, the circuit court originally did not address the constitutional claims because it concluded that section 2 vote dilution had been proved.  Because the circuit court had not addressed the issue, it was proper for the Supreme Court to remand rather than consider an issue not considered by the circuit court." (citing Duignan v. United States, 47 S. Ct. 566, 568 (1927) ("This court sits as a court of review.  It is only in exceptional cases coming here from the federal courts that questions not pressed or passed upon below are reviewed."))).  Nor is the court's conclusion in this case undercut by the fact that, on remand in Holder, the lower courts dismissed the plaintiffs' constitutional claims based on the plaintiffs' failure to prove discriminatory intent instead of dismissing them on the basis that they could not succeed because
(continued...)

## IV.   Conclusion and Order

The plaintiffs have failed to state a claim for which relief can be granted.  Accordingly, Defendants' Motion to Dismiss (Docket Entry No. 4) and Defendants' Supplemental Motion to Dismiss (Docket Entry No. 27) are **GRANTED**.[51]

**SIGNED** at Houston, Texas, on this the 22nd day of May, 2009.

SIM LAKE
UNITED STATES DISTRICT JUDGE

---

[50](...continued)
the plaintiffs were unable to establish a violation of § 2's "less rigorous" standard and/or to identify a workable benchmark.  See Hall v. Holder, 117 F.3d 1222, 1224 (11th Cir. 1997).  The district court had originally dismissed the constitutional claims based on the plaintiffs' failure to show discriminatory purpose, and on remand, the district court simply "reaffirmed its prior order, stating that it saw no reason to 'revisit' the equal protection issue . . . ." Id.

[51]If the plaintiffs' complaint, after having been amended, fails to state a claim, the court has discretion to grant leave to amend the complaint again.  Fed. R. Civ. P. 15(a); United States ex rel. Willard v. Humana Health Plan of Texas, 336 F.3d 375, 387 (5th Cir. 2003).  The plaintiffs, however, must first request the opportunity to amend, "set[ting] forth with particularity the grounds for the amendment and the relief sought." Id. (citing Fed. R. Civ. P. 7(b)(1); Fed R. Civ. P. 15(a); Edwards v. Occidental Chem. Corp., 892 F.2d 1442, 1445-46 (9th Cir. 1990)).  Because the plaintiffs have not requested the opportunity to again amend their complaint, the court will dismiss the action.